In the
# United States Court of Appeals
### For the Seventh Circuit


CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Nos. 11-3188 & 11-3746

IRA HOLTZMAN, C.P.A., & ASSOCIATES LIMITED, individually and as representative of a class,

*Plaintiff-Appellee,*

*v.*

GREGORY P. TURZA,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 2014 — **Robert W. Gettleman**, *Judge.*

_____

ARGUED MAY 22, 2012 — DECIDED AUGUST 26, 2013

_____

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge.* Believing that CPAs would find his services attractive, attorney Gregory Turza sent more than 200 of them occasional fax sheets containing business advice. The faxes produced more business—but not for Turza. He became the defendant in this suit under the Telephone Consumer Protection Act of 1991, 47 U.S.C. §227,

Case: 1:08-cv-02014 Document #: 279 Filed: 10/02/13 Page 2 of 14 PageID #:5864
Case: 11-3188   Document: 00712085321   Filed: 10/02/2013   Pages: 14

Nos. 11-3188 & 11-3746 2

which prohibits any person from sending unsolicited fax advertisements. Even when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages. 47 U.S.C. §227(b)(1)(C)(iii), (2)(D). Turza's faxes did not contain opt-out information, so if they are properly understood as advertising then they violate the Act whether or not the recipients were among Turza's clients.

The faxes bear the masthead The "Daily Plan-It", but they were not produced by Perry White's editorial staff and came every other week rather than daily. Although they carry Turza's byline, and a notice claiming copyright in his name, they had been written by employees of Top of Mind, a marketing firm, which sold the concept (and the copy) to anyone who wanted promotional material. Turza did not edit or even review the faxes before they were sent in his name. But Turza does not contend that Top of Mind is responsible as the "person" who sent the faxes. The district court held that the faxes are "unsolicited advertisements" and entered summary judgment against Turza. 2010 U.S. Dist. LEXIS 80756 (N.D. Ill. Aug. 3, 2010).

The court earlier had certified a class of the faxes' recipients. 2009 U.S. Dist. LEXIS 95620 (N.D. Ill. Oct. 14, 2009). In 2011 the court denied a motion to reconsider both the class certification and the decision on the merits. 2011 U.S. Dist. LEXIS 97666 (N.D. Ill. Aug. 29, 2011). The court ordered Turza to pay $500 in statutory damages for each of 8,430 faxes. The total comes to $4,215,000. In its final order, the district judge allocated this sum as follows: $7,500 to the representative plaintiff, which received 32 faxed editions of The "Daily

Plan-It" (although the judge called this an "incentive award", it is less than the $16,000 entailed by 32 faxes at $500 a fax); $1,430,055.90 to class counsel for attorneys' fees and expenses; and any residue, after payments to class members, to the Legal Assistance Foundation of Metropolitan Chicago "as a *cy pres* award". Oddly, the judge did not say how much each recipient who submits a claim receives. Is it $500 per fax, on the assumption that enough would go unclaimed to cover the attorneys' fees? Or is it $330.72 per fax, the number appropriate if attorneys' fees (and the award to plaintiff) come off the top? The question may be academic, because Turza has not ponied up the fund and may be unable to do so. But we must reach the procedural and substantive questions before deciding how much Turza owes.

Class certification is normal in litigation under §227, because the main questions, such as whether a given fax is an advertisement, are common to all recipients. See *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005). There can be doubt about whether a particular person is a good representative of the class, and whether class counsel is suitable, see *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913 (7th Cir. 2011); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011), but Turza does not question the adequacy of the class representative or its chosen counsel. Because Top of Mind omitted opt-out notices, it does not matter which recipients consented or had an established business relation with Turza. Contrast *Gene & Gene LLC v. Biopay LLC*, 541 F.3d 318 (5th Cir. 2008). Nonetheless, he contends, class certification is inappropriate because individual issues about who received how many faxes predominate over the common questions.

Case: 1:08-cv-02014 Document #: 279 Filed: 10/02/13 Page 4 of 14 PageID #:5866
Case: 11-3188    Document: 00712085321    Filed: 10/02/2013    Pages: 14

Nos. 11-3188 & 11-3746                                             4

To the extent Turza contends that each recipient must prove that he printed the fax (wasting paper) or otherwise suffered monetary loss, he is wrong on the law. The statute provides a $500 penalty for the annoyance. 47 U.S.C. §227(b)(3)(B). Even a recipient who gets the fax on a computer and deletes it without printing suffers *some* loss: the value of the time necessary to realize that the inbox has been cluttered by junk. That loss, and the statutory remedy, are the same for all recipients; the sort of problem that prevented class certification in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), does not arise.

To the extent Turza contends that each recipient must prove that his fax machine or computer received the fax, he is right on the law but wrong on the facts. The record establishes which transmissions were received and which were not. Top of Mind hired MessageVision to send the faxes. It compiled information about which faxes were received, and by whom; no reasonable juror could conclude that these data are inaccurate.

Transmitting a fax requires a sending and a receiving machine to communicate using a standard protocol. If the transmission ends successfully, the receiving machine sends a code indicating this. MessageVision kept a log of the codes received during the process of sending Turza's faxes. This log shows that it tried to send a total of 11,945 faxes to 221 unique numbers; the receiving fax machines reported that 8,630 of these were delivered successfully. (Five persons, who collectively received 200 faxes, opted out of the class; that's why the district court used 8,430 faxes as the basis for calculating damages.) Turza has not offered any reason to think that MessageVision's fax machines recorded the codes

Case: 1:08-cv-02014 Document #: 279 Filed: 10/02/13 Page 5 of 14 PageID #:5867
Case: 11-3188    Document: 00712085321    Filed: 10/02/2013    Pages: 14

5                                                                  Nos. 11-3188 & 11-3746

inaccurately or that its software maintained the log incorrectly. There is accordingly no need for recipient-by-recipient adjudication, and the district court did not err in concluding "that the questions of law or fact common to class members predominate over any questions affecting only individual members". Fed. R. Civ. P. 23(b)(3).

Turza relies on *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473 (7th Cir. 2009), for the proposition that electronic confirmation of a fax's receipt could be refuted by other evidence. That's true enough. The question in *Laouini* was whether a charge of discrimination had been received by the agency on the last date allowed for filing. Plaintiff produced a record of a successful fax transmission on that date—but perhaps plaintiff had faxed a document other than a charge of discrimination (none was in the agency's records), or perhaps the clock on the sender's fax machine was incorrect and the transmission was too late. We held in *Laouini* that in the absence of evidence on such matters, however, the electronic confirmation suffices. That's equally true here, because the record would not permit reasonable jurors to reject the fax log. Indeed, this case is easier, because there is no doubt *what* MessageVision sent out, and *when* each issue of The "Daily Plan-It" was sent does not matter.

That Ira Holtzman, the principal of the representative plaintiff, retained and remembers only one of the faxes does not call the logs into question. Holtzman testified by deposition that his secretary screened and deleted unwanted faxes. Turza has not demonstrated that even a single entry in MessageVision's log was inaccurate, and its corporate representative explained in detail how the logs were compiled. There is no material dispute requiring trial.

Nos. 11-3188 & 11-3746                                             6

The only question on the merits is whether the faxes contained ads. "Unsolicited advertisement" is a defined term, meaning "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. §227(a)(5). The faxes Top of Mind devised for Turza may not have touted the quality of his services, but they did declare their availability. Here is a copy of the first issue plaintiff received:

Case: 1:08-cv-02014 Document #: 279 Filed: 10/02/13 Page 7 of 14 PageID #:5869
Case: 11-3188    Document: 00712085321    Filed: 10/02/2013    Pages: 14

7                                       Nos. 11-3188 & 11-3746

Deliver to: Ira Holtzman

# The "Daily Plan-It™"

*GREGORY P. TURZA, JD*

Volume 9, Issue 22                                              11/1/2007

## You *Can* Take it With You: Tips for A Mobile Office

Computers have become such a part of the corporate world, it would be almost impossible to find an organization without one. These days, with people working from home and while traveling, laptops are outselling their larger and bulkier desktop brethren. Most executives have both, although many are using their laptops as their primary computers, thanks to their portability. Here are some practical tips for getting the most out of your laptop, whether you're at the office, at home, or on the road.

### Buying tips

The portable computer is now available at very affordable prices, with low-end models beginning at around $500. The more expensive models are on a par with desktops as far as speed and storage are concerned. When purchasing a laptop, pay attention to the following:

- Stick to name brand manufacturers. Customer support will be more reliable.
- If you plan to use it a lot on the go, find one that's under 5 lbs.
- Look for a model with a spill-resistant keyboard and a shock resistant hard drive.
- Purchase an extended warranty, generally for three years. Even if you have just one problem, it will pay for itself.
- Make sure that the screen is not too small for your eyes, and that the keyboard fits comfortably under your fingertips.
- If you plan to use it at the office and on the go, set up a "docking station" at your desk which would include a keyboard, mouse, and monitor.

### Printing on the go

If you're on the go and need to print important documents, it's not always convenient to find a Kinko's. Purchase a small travel printer which can easily fit in your computer bag. Both Hewlett Packard and Canon have a variety of models that are less than 5 lbs and sell for under $250.00

### Protecting your stuff

Whether you're stationary or on the road, you need to back up your stuff. Purchase a USB flash drive, which is the size of a thumb, and you'll be able to back up and print from any computer.

Take measures to protect your unit from theft. Carry it in an inconspicuous case, and never leave it unattended, even for a moment. All information should be protected with a secure password. If you're using it in a hotel room, hide it before you leave. And always back up your data.

Thanks to those measures, you can now take your work anywhere you go. Just don't forget to take some time off, or you may burn out.



ESTATE PLANNING
POST MORTEM ADMINISTRATION
BUSINESS SUCCESSION PLANNING

### Gregory P. Turza
ATTORNEY & COUNSELOR AT LAW



Concourse Plaza
4711 Golf Road
Suite 550
Skokie, Illinois 60076

Telephone: (847) 674-0200
Facsimile: (847) 674-9115
greg@myestateplan.net
www.myestateplan.net

© 2007 GREGORY P. TURZA, JD, Phone: 847-674-0200. All rights reserved.
No portion of this newsletter may be reused in any way without prior express written consent.

Like the other issues, this one devotes about 75% of the space to mundane advice and the remainder to Turza's name, address, logo, and specialties. The district court thought it impossible for any reasonable juror to doubt that this fax plugs the commercial availability of Turza's services. Top of Mind told its clients, including Turza, that The "Daily Plan-It" is a "promotional" device, and Turza's own lawyer called it "marketing" in his brief and oral argument. That simply recognizes the obvious.

Turza contends that the 25% of the fax alerting potential clients to the availability of his services is "merely incidental" to the 75% that delivers business advice. But the statute does not ask whether a notice of availability is incidental to something else. If Macy's faxes potential customers a page from the *New York Times* that is devoted 75% to news about international relations and 25% to an ad for goods on sale at Macy's, it has sent an advertisement. That 75% of the page is *not* an ad does not detract from the fact that the fax contains an advertisement.

Section 227(b)(2) gives the Federal Communications Commission authority to issue regulations implementing the statute, and Turza maintains that the FCC has adopted a rule that incidental ads don't count under the Act. Turza does not cite to any such regulation, however. The FCC has defined "advertisement" in language that closely tracks the statute. "The term advertisement means any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. §64.1200(f)(1). The "Daily Plan-It" satisfies that definition; we are tempted to ask what part of "any" Turza finds hard to understand. (We have quoted the current definition; the regulation in force when Turza sent his

ads defined "unsolicited advertisement" in the statutory language. See 47 C.F.R. §64.1200(f)(13) (2007).)

The FCC's use of "incidental" appears not in the regulation but in the explanation the agency gave when adopting the regulation. The FCC wrote:

> [F]acsimile communications that contain only information, such as industry news articles, legislative updates, or employee benefit information, would not be prohibited by the [statutory] rules. An incidental advertisement contained in such a newsletter does not convert the entire communication into an advertisement. (In determining whether an advertisement is incidental to an informational communication, the Commission will consider, among other factors, whether the advertisement is a bona fide "informational communication." In determining whether the advertisement is to a bona fide "informational communication," the Commission will consider whether the communication is issued on a regular schedule; whether the text of the communication changes from issue to issue; and whether the communication is directed to specific regular recipients, *i.e.*, to paid subscribers or to recipients who have initiated membership in the organization that sends the communication. The Commission may also consider the amount of space devoted to advertising versus the amount of space used for information or "transactional" messages and whether the advertising is on behalf of the sender of the communication, such as an announcement in a membership organization's monthly newsletter about an upcoming conference, or whether the advertising space is sold to and transmitted on behalf of entities other than the sender). Thus, a trade organization's newsletter sent via facsimile would not constitute an unsolicited advertisement, so long as the newsletter's primary purpose is informational, rather than to promote commercial products. The Commission emphasizes that a newsletter format used to advertise products or services will not protect a sender from liability for delivery of an unsolicited advertisement under the [statute] and the Commission's rules. The Commission will review such newsletters on a case-by-case basis.

71 Fed. Reg. 25967, 25973 (May 3, 2006).

This passage is mysterious. It does not elaborate on the meaning of the word "advertisement" in the statute or regulation. Instead it discusses the meaning of "informational communication", a phrase that does not appear in either §227 or the regulation. It seems to be a species of untethered legislative history—and the Supreme Court has told us that, although legislative history may assist in understanding an ambiguous text, a freestanding declaration untied to an adopted text must be ignored. See, e.g., *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).

Perhaps this passage is best understood as a declaration of the Commission's enforcement plans. Section 227 authorizes private litigation, however; recipients need not depend on the FCC. At all events, even the passage on which Turza so heavily relies declares that "a newsletter format used to advertise products or services will not protect a sender from liability for delivery of an unsolicited advertisement". The "Daily Plan-It" has a newsletter format, but it is not remotely like a trade association's newsletter to its members or a law firm's newsletter alerting clients to legal developments. The plug for Turza's services was not incidental to a message that would have been sent anyway; promotion or marketing was the reason these faxes were transmitted. Like the district court, we conclude that The "Daily Plan-It" is an advertisement as a matter of law.

Now for the remedy. The district judge ordered Turza to pay $4,215,000 but did not say to whom. To the court's registry? To plaintiff's lawyers, as agents for the class's members? To a third-party administrator? None of the individual class

members is entitled to $4,215,000 or anything like that much—and it is the persons who got the faxes, not "the class" as a whole, who are entitled to damages under §227(b)(3). A class certified under Rule 23(b)(3) is not a juridical entity. Decisions such as *Zahn v. International Paper Co.*, 414 U.S. 291 (1973), and *Clark v. Paul Gray, Inc.*, 306 U.S. 583 (1939), which hold that class members' losses cannot be aggregated to reach the minimum required for diversity jurisdiction, demonstrate this principle. Each class member has an interest in his own damages. See *Gilman v. BHC Securities, Inc.*, 104 F.3d 1418, 1427 (2d Cir. 1997). Some class actions stem from aggregate and undifferentiated injuries; these create genuine common funds. But this action stems from discrete injuries suffered by each recipient of the faxes; it does not create a common fund. *Travelers Property Casualty v. Good*, 689 F.3d 714 (7th Cir. 2012), discusses how to identify genuine common-fund cases.

Because the district judge contemplated that Turza would pay a lump sum to (or for) the class as a whole, the judge had to decide what would happen if some of the money went unclaimed. Without soliciting the parties' views, the judge declared that any residue would be turned over to a charity rather than be returned to Turza. (Plaintiff contends that Turza forfeited any objection to this decision by not protesting it in the district court, but "[a] formal exception to a ruling or order is unnecessary." Fed. R. Civ. P. 46. Given the opportunity, parties must state their positions before the fact; they need not remonstrate with a judge who decides an issue without giving the litigants a chance to state their positions.) The judge did ask the parties which charity they preferred, and from their suggestions he selected the Legal Assistance Foundation of Metropolitan Chicago. He called this

Nos. 11-3188 & 11-3746                                                12

a "*cy pres* award", but as we explained in *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 784 (7th Cir. 2004), this is a misnomer—though one common in the legal literature. See Comment, *Damage Distribution in Class Actions: The Cy Pres Remedy*, 39 U. Chi. L. Rev. 448 (1972) (using the *cy pres* doctrine of trust law as an analogy).

Turza contends that any residue belongs to him. The district judge thought otherwise but did not say why—and, as it is far from clear that Turza has the money needed to pay the class members who submit claims, it is premature to decide whether and, if so, when, defendants are entitled to refunds of any surplus. The district judge may not have appreciated the difference between common-fund suits and those that arise from individual injuries. It may well make sense for the district judge to direct Turza to pay the damages into the court's registry, or to a third-party administrator, so that members of the class can receive pro rata distributions if it turns out that Turza cannot satisfy the full award. Only if Turza pays more than enough to satisfy all claims by class members will it be necessary to decide whether the residue goes back to him or is put to some other use.

This also means that it was premature for the district court to have directed that any remainder be turned over to a particular charity. It was doubly inappropriate to enter such an order without soliciting argument from the litigants and without discussing the difference between common-fund suits and those involving the use of the class device to vindicate individually held claims.

Charitable distribution of remainders in class actions originated when courts had to deal with non-reverter clauses in common-fund settlements. If the defendant settles a suit

for a sum certain, and disclaims any right to whatever remains after claims from class members have been paid, then the court has to do something with what's left over. Escheat to the state is one possibility. Another is an augmented recovery for those class members who submitted claims. Still a third option, under the *cy pres* banner, is distribution to a group that will use the money for the benefit of class members. This third option is most useful when individual stakes are small, and the administrative costs of a second round of distributions to class members might exceed the amount than ends up in class members' pockets.

Our case did not end in settlement and is not a common-fund situation. Turza did not agree to give up his interest in money unclaimed by class members. The stakes per fax are large enough to make a second round of distribution feasible. And the Legal Assistance Foundation of Metropolitan Chicago does not directly or indirectly benefit certified public accountants, the victims of Turza's junk faxes. The Foundation is a worthy organization, but many courts have expressed skepticism about using the residue of class actions to make contributions to judges' favorite charities. See, e.g., *In re Lupron Marketing & Sales Practices Litigation*, 677 F.3d 21, 31–38 (1st Cir. 2012); *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 475–76 (5th Cir. 2011), and *id*. at 480–82 (Jones, C.J., concurring); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038–39 (9th Cir. 2011).

Money not claimed by class members should be used for the class's benefit to the extent that is feasible. See *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990); *Dennis v. Kellogg Co.*, 687 F.3d 1149 (9th Cir. 2012). See also, e.g., ALI, *Principles of the Law of Aggregate Litigation*

Nos. 11-3188 & 11-3746                                           14

§3.07 (2010); Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (2010). Perhaps that would not be feasible here, making other charities more suitable as recipients, but the absence of an adversarial presentation—and the considerable doubt that Turza will be able to pay enough to allow full payment to class members who submit claims—means that such a decision would be premature.

The district court's decision on the merits is affirmed, but the remedial order is vacated. The case is remanded with instructions to enter a judgment requiring Turza to remit to the registry or to a third-party administrator. Once the court knows what funds are available for distribution, it should (if necessary) reconsider how any remainder will be applied. It may also be necessary to reconsider the "incentive award" to the representative plaintiff (which appears to be a "disincentive award") and the way in which class counsel are compensated. See *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).